MILES ALVIN BOOTEE, RESPONDENT, v. KANSAS CITY PUBLIC SERVICE COMPANY, A CORPORATION, APPELLANT.—199 S. W. (2d) 59.

Kansas City Court of Appeals.  January 13, 1947.

1066

*Charles L. Carr, John T. Harding, R. Carter Tucker, John Murphy* and *William H. Wilson* for appellant.

1068

*E. E. Thompson, Alfred H. Osborne* and *J. H. Greene, Jr.* for respondent.

DEW, J.—This is an action for damages for personal injuries, claimed to have been sustained by plaintiff (respondent) June 19, 1942, through the negligence of defendant (appellant). Verdict and judgment were in favor of plaintiff in the sum of $10,000. The judgment was reduced by remittitur to $5000, from which defendant has appealed. There had been a former trial of this cause and an appeal to the Supreme Court of Missouri, and the cause was reversed and remanded. [Bootee v. Kansas City Public Service Company, 183 S. W. (2d) 892.]

Such of the allegations of the petition as are here pertinent are that on June 19, 1942, while plaintiff was walking north on the west side of Woodland Avenue, across 15th Street, in Kansas City, Missouri, and was almost across 15th Street, defendant, through its agent and servant, so carelessly and negligently operated its bus west on 15th Street as to cause same to collide with plaintiff, knocking him to the street and injuring him. He alleged that he was proceeding properly within the pedestrian lane, and on the proper green signal for northbound traffic on Woodland Avenue. While the petition contains allegations of alleged primary negligence, the cause was submitted on the allegations of the humanitarian doctrine. Such allegations were, in substance, that defendant saw, or in the exercise of the highest degree of care could have seen, plaintiff in a position of imminent peril of being struck by defendant's bus in question, in sufficient time thereafter, with safety to himself and the passengers on said bus, to have slowed the speed of the bus, or to have stopped the same, or swerved it aside, and to have sounded a timely and effective warning or signal of the approach of the bus, and thereby to have avoided striking plaintiff, all of which defendant negligently failed to do, and as a direct result thereof, plaintiff received permanent injuries as set forth.

The amended answer was a general denial and a plea of contributory negligence. It alleged that plaintiff was, for all practical purposes, a blind person; that he knew his impaired vision amounted substantially to no vision; that he knew the intersection in question was a busy thoroughfare; that he knew a strong wind and rain storm was in progress at the time; that he crossed 15th Street in violation of city ordinances defining the pedestrian crossing lanes; that he negligently attempted to cross the street against the red light and not the green signal; that he negligently attempted to cross the street without proper escort to see that he was crossing on the proper signal, and that a vigilant lookout was not maintained such as an ordinarily careful and prudent person would have exercised; that he carelessly ran in the path of defendant's bus when he saw, or by the exercise of ordinary care could have seen, the approach of said bus, and that it was immi-

nently hazardous and perilous to attempt to cross in front thereof; that he knew that other persons using the street would not know of his physical impairment; and he negligently placed himself in a dangerous position in the path of said bus, and failed to exercise ordinary care for his own safety at said time and place.

15th Street runs east and west, and Woodland Avenue runs north and south. 15th Street, at the intersection in question, is 76 feet and 3 inches wide from curb to curb, and Woodland Avenue is 30 feet and 2 inches wide from curb to curb. There are automatic traffic lights on all four corners of this intersection, and on the southwest corner there is also a street light. For a space of 100 feet or more west of the street light on the southwest corner, there is no light on the south side of 15th Street west of Woodland. While there are buildings on the other corners, the southwest corner contains no buildings, but is a part of the city park known as "Paseo Park."

The bus in question was one of defendant's electric buses operated by electricity conveyed by trolley wires through the trolley of the bus to the bus motor. Defendant regularly operated such buses west and east on 15th Street. The intersection was level, but 15th Street slightly declined westward from the west side of Woodland.

Plaintiff, a young colored man, aged 23 years, testified that on the evening of June 18, 1942, he had been visiting with his aunt at 13th and Woodland, where he arrived at about 9:30 p.m., but on account of the fact that it was raining during the evening, he did not leave the house until about 20 minutes past midnight; that he intended to walk by way of Woodland Avenue to 24th Street, and from thence to his home nearby. Accordingly, he walked south on the west side of Woodland Avenue, and when he arrived at 15th Street, he proceeded across in the pedestrian lane to the southwest corner of the intersection and there, because it began to rain harder, decided to return to his aunt's house. He turned around, waited on that corner for the green light, while also watching the light on the northwest corner, and when the light showed green on the northwest corner, he started walking fast, retracing his steps back across 15th Street toward the northwest corner, and in the pedestrian lane. At the time he started to return across 15th Street he saw the defendant's bus standing still on the northeast corner of the intersection. No other vehicle was approaching the intersection at the time. The next time he saw the bus it was 6, 8, or 10 feet directly east of him, and plaintiff was practically an equal distance between the two headlights. Plaintiff tried to jump out of the way of the bus and was struck by the bus on his right side. At the time he was struck he was about 6, 8, or 10 feet from the north curb of 15th Street. He was rendered unconscious, and when he regained consciousness he was on the bus and someone was standing over him, talking to him. Plaintiff estimates the speed of the bus when he saw it approaching him as 6, 8, or 10 miles an hour. He said the

speed was not slackened before he was struck, nor was the bus swerved in either direction, nor was any horn or signal sounded or given. Plaintiff was taken in the bus for some distance and later to the police station, and then to the hospital by ambulance. At the hospital the physician taped the plaintiff's shoulder, whereupon plaintiff left and returned later the same morning. X-rays were then taken of the shoulder and it was again taped. Thereafter the plaintiff was treated by Dr. Turner at plaintiff's home and at the doctor's office.

Plaintiff testified that he received an injury to the right side of his head, his right shoulder, and below the knee, and also received injuries to his back and stomach; that previous to the collision he had never had any serious injury. He stated that before the accident he had been working on an ice truck and on a moving truck; that he worked all the year 1941, on an ice route, and in 1942, on a truck. These jobs required the use of his arms and shoulders. He was treated four or five weeks in his home after the injury, and at the time of the trial was keeping house for his mother, who was employed as a cook. He had attempted since the accident to work again on the moving job but was unable to lift anything heavy, and his arms and shoulders quickly tired. At the time of the trial he was suffering from pain in his shoulder and in the back. He stated that since 1931, his eyesight had been impaired; that he could not see to read, but could see colored lights.

Upon cross-examination plaintiff said that he had no difficulty in seeing vehicles, and denied that he was usually helped across the street. He admitted that in 1931, he was in General Hospital No. 2, Kansas City, Missouri, for an examination of his eyes. He was again in a hospital in 1936, for an operation on his eyes because of a scum covering the eyeballs; that the operation did not remove the affliction. He admitted that he did not have a clear cut vision, but could recognize the features of people that he knew. Plaintiff admitted that he had been in Bell Memorial Hospital in Kansas City, Kansas in 1934 or 1935, when he was 13 years old, for eye tests. He stated that they also took a blood test, and he was told that the test showed perfect. He said he returned three weeks later to the hospital and most of the conversation then was between the physicians and plaintiff's mother. He stated that he again took a physical examination at Leavenworth for army service. In further regard to plaintiff's injuries, plaintiff stated that he could not lift his arm higher than the level of his shoulder without pain.

The Superintendent of the defendant company, called by the plaintiff, testified that the type of the bus in question was 32½ feet long over all, with a front door and a side door; that electric power propelling the car comes from overhead trolley wires, through the trolley and down to the motor, and the power is applied by the operator with a foot pedal. The bus may be swerved 12 feet either direction

from a point directly under the trolley wires without detaching the trolley wires, and if swerved further, the effect would be only to detach it from the trolley wires, and the brakes would not be affected. He testified that under the conditions obtaining at the intersection on the occasion of the accident, the bus could have been stopped with reasonable safety to the passengers and operator and the bus, in an emergency, while traveling 10 miles an hour, within 15 to 20 feet, on level grade. He said that if the grade was 4 or 5 feet downward, the distance within which the bus could be stopped would be increased 4 or 5 feet. If the bus were going 8 miles an hour, it could be stopped with reasonable safety within 10 to 12 feet; at 6 miles an hour, it could be stopped in 6 to 8 feet. He testified that it was the duty of the operator as an employee of the defendant company to answer questions of police officers pertaining to the facts of the collision.

One witness in behalf of plaintiff testified that he operated a garage about 75 feet south of 15th Street on the east side of Woodland Avenue; that from there he saw the collision of defendant's bus with the plaintiff. He first saw the plaintiff when plaintiff was 20 to 25 feet from the north curb of 15th Street, while plaintiff was walking north across 15th Street in the pedestrian lane, and was "walking kind of fast." The bus at that time was within 15 feet east of the plaintiff, who was in front of the bus, which was traveling about 12 miles an hour; that when the bus hit the boy, the bus was proceeding at about the same rate of speed. Witness heard no horn sounded, nor noticed any change in the course of the bus before it hit the plaintiff. Witness went to the corner and saw two men carrying the plaintiff into the bus, which was just across the intersection, the rear of the bus being opposite the pedestrian lane on the west side of Woodland Avenue. They were somewhere between the front and rear doors of the bus. He said it had been raining hard but the rain had slackened up a bit at the time of the accident. When the witness first saw the bus he judged it was traveling 20 or 25 feet from the north curbline of 15th Street, and was about ten feet east of the pedestrian lane on the west side of Woodland Avenue.

The plaintiff being recalled, the court room was darkened and a line of different colored lights was placed on a cord in the court room. Plaintiff stated that he could see the lights and correctly stated the color of the various lights shown, but when asked how many there were, he answered "four," when there were, in fact, six. On cross-examination he correctly called the proper color of some of the lights, but at times incorrectly stated the number of the lights. On two occasions he was asked what was the color of the lights defendant's counsel was pointing to, and answered that he could not tell. It was further brought out that he could see lights better in the dark than when it

was light.  He said he was wearing a blue suit and a gray hat at the time of the accident.

The records of General Hospital No. 2 showed plaintiff's attendance there in 1931 and in 1936; X-rays were there taken; Wasserman-Kahn tests were recorded as negative in 1931; in June, 1932, the records showed "dislocated shoulder."  Plaintiff was confined in said hospital from June 20 to August 6, 1936.

Plaintiff's physicians testified from physical examination of plaintiff and from X-rays that there was a relaxation of the right shoulder joint, a distinct separation of the acromion process of the clavicle, commonly known as the collar bone, a rupture of the ligaments that hold the shoulder bones in place; that later X-rays showed a degeneration or absorbtion developing at the end of the clavicle; that the separation of the bones and degeneration mentioned were caused by trauma; that plaintiff suffers in raising his arm and has a 40 to 50 percent disability in movements of the arm and shoulder; that these conditions are permanent.  Wasserman and Kahn tests made since the trial began showed negative.

A laboratory technician testified that she had made a Wasserman and a Kahn test of the plaintiff since the trial began, and that the same showed negative.  Dr. Donaldson, recalled, stated that the report of such tests practically establishes conclusively that the plaintiff does not have syphilis.  The plaintiff, recalled, testified, that he had not taken any shots of any kind, or treatment at the laboratory or hospital other than the treatments in 1942, following the accident, nor had he been to any other doctor except Dr. Black, at the request of the defendant, and Dr. Donaldson, to have the X-rays taken.

Plaintiff's mother testified that her son had never been injured in any way before the accident; that he had never lost use of any part of his body before that time; that, however, the eye condition developed in 1931; that the plaintiff was 23 years of age; that before the injury he helped on a truck, doing light work, such as hauling; that he now does only work about the house, such as making fires, taking out ashes, and the like.  She confirmed plaintiff's statement of treatments by Dr. Turner since the accident; that he at one time had been in General Hospital No. 2, and Bell Memorial Hospital; he had never made any complaint of his right shoulder prior to June 19, 1942.  On cross-examination she stated that in October, 1934, when plaintiff was thirteen years old, he was treated once a week for a period at the Bell Memorial Hospital for his eye condition.  Plaintiff at one time was completely blind for two weeks.  She denied that anybody at the hospital reported to her that plaintiff had any infectious disease at the time he attended Bell Memorial Hospital, nor did they discuss with her the cause of his eye trouble.  Plaintiff had been operated on at General Hospital No. 2 for his eyes when he was eleven years of age, and again in 1936.

Plaintiff introduced a city ordinance which gives the pedestrian starting across or within a crosswalk of a street intersection on the green signal, right of way over all vehicles, including those making turns, until the pedestrian has reached the opposite curb or safety zone, and declares it unlawful for the operator of the vehicle to fail to yield such right of way to such pedestrian.

At the close of plaintiff's evidence, defendant moved for a directed verdict in favor of defendant for the reason that plaintiff had wholly failed to prove his case. This motion was overruled.

Records of the Bell Memorial Hospital were introduced and showed plaintiff as an out-patient there in 1934; that he was then suffering from inflammation of the cornea of the eye; that a Wasserman and Kahn test showed 4 plus.

Physicians testifying for defendant from physical examination and X-rays testified that plaintiff was partially blind; that in view of the blood tests in 1934, it was their opinion the eye condition was due to syphilis; that there was a separation of the bones of the shoulder and a rupture of the ligaments connecting the same, caused by trauma or disease.

Dr. Brust testified for the defendant that he had made a physical examination of the plaintiff in 1942, and, among other things, found that plaintiff was blind in his right eye and was able to count his fingers with his left eye, three feet away, and then only if the hand was held at the eye level; that plaintiff had a deformity of the right shoulder due to rupture or separation of the joint between the shoulder bone and shoulder blade; that there is little limitation of movement of the shoulder, but that it was lower than the opposite shoulder. In his opinion the condition of plaintiff's eyes was due to congenital syphilis. On cross-examination he admitted that at the time of the examination it was his opinion that the rupture of the ligaments and separation of the bones resulted from trauma, and that it was still his opinion.

In further behalf of the defendant several passengers on the bus testified of the stormy conditions; that the bus stopped on the east side of Woodland Avenue before crossing the intersection, and then crossed at about five miles an hour on proper signal; that they heard a "thud" or "thump" and immediately thereafter the bus came to a stop 15, 30 or 60 feet west of Woodland Avenue; that there was no slackening of speed, no swerving of the bus, nor warning given before the "thud" was heard; that the location could be identified by the buildings near the bus; that after the bus stopped, the plaintiff was lying in the street with his head six inches or thereabouts from the curb, and his feet about three feet from the bus; that the driver and another person assisted plaintiff onto the bus; that plaintiff walked, with assistance, and took a seat in the right front corner of the bus, and was wholly conscious. One passenger said the "thud" occurred when the bus was even with the pedestrian lane of Woodland Avenue.

Another passenger, who sat in the third seat from the front on the left hand side and next to the window, testified that just before hearing the "thud," she saw an object moving across 15th Street from the south, and almost immediately the object went out of her view and the bus stopped at about 50 feet west of Woodland Avenue. She could not tell whether the object was a man, bush or tree, and that at the time she saw the object it was 2½ to 3 feet south of the path of the bus, and she did not know whether the object was in the pedestrian lane at the time or not.

Defendant introduced a city ordinance declaring the pedestrian lane to be "that portion of the roadway ordinarily included within the prolongation or connection of curb at property line at intersections or any other portions of a roadway clearly indicated for pedestrians crossing by lines or other markings on the surface." Defendant also introduced a city ordinance to the effect that the traffic facing a green signal light may proceed, except the vehicular traffic shall yield a right of way to pedestrians and vehicles lawfully within a crosswalk or the intersection at the time such signal was exhibited. A further ordinance was introduced requiring pedestrians to use the right half of the crosswalk.

The operator testified to the severity of the rain and wind storm prevailing at the time of the accident; that it was almost impossible to discern any object in the street except by the rays of the headlights; that it was dark toward the southwest corner of the intersection on account of the unlighted park area adjacent to same; that he did not see the plaintiff over on the south half of 15th Street; that when he first saw plaintiff, the latter was about six feet in front of the bus and within the rays of the left headlight; when witness first saw plaintiff, the plaintiff was running. Witness was then traveling at about 6 miles an hour, and when he saw the plaintiff in front of the bus he immediately applied his brakes and sounded the horn, and swerved his bus to the right about 2 feet. He had stopped the bus on the east side of Woodland Avenue to take on or let off passengers and at the time the plaintiff appeared in front of the bus, the bus was west of Woodland Avenue about 50 feet, and beyond the crossing. After the bus hit plaintiff, the bus traveled 2 or 3 feet. After the collision the plaintiff was lying about even with the middle of the front door, which is near the front right corner of the bus, and plaintiff's feet were within 2 or 3 feet of the front door, his head within a foot or two of the north curb. The bus at the time was 8 or 10 feet from the north curb of 15th Street. He said his bus, after reaching the east side of Woodland Avenue, was never as far out as 20 feet from the north curb of 15th Street up to the time of the accident. Witness got out and assisted the plaintiff into the bus, and plaintiff took a seat and sat there without any assistance. Plaintiff was entirely conscious and carried on some conversation. Witness asked plaintiff where he was

going; obtained his name and address, and inquired of plaintiff about the film over his eyes. Plaintiff replied that he had a scum over his eyes and could not see very well. Upon inquiry plaintiff told the witness that his right shoulder was hurt a little bit. Witness drove the bus to 15th and The Paseo and called the Chief Dispatcher by telephone and received instructions to proceed to 8th and Walnut Streets. At the latter location, plaintiff got off the bus without assistance and the company operator and the police took charge of him.

The operator testified that the bus was equipped with air brakes and he could stop the bus in 5 or 6 feet when going at 5 miles an hour. He stated that there was a slight down-grade westward from the northwest corner of the intersection and that he applied all the braking power that he had at the time of the accident. He said that if a pedestrian would start when the green light came on, he could make the crossing from the southwest to the northwest corner of the intersection at a moderate rate before the change of signals. He stated that he could swerve the bus 12 feet in either direction without detaching the trolley; that the bus was about 8 feet wide, and was about 8 or 10 feet from the north curb, so that the left side of the bus would be 16 to 18 feet from the north curb. He estimated that he traveled about 4 feet after the collision; that traveling 10 miles an hour under the conditions existing, he could have stopped within 10 or 12 feet, with reasonable safety to the passengers, the bus and to himself, provided that the car was on the level part of the area involved. In his prior deposition he had testified that he could stop in 6 to 7 feet, approximately.

In rebuttal, plaintiff produced witness Gardner, a police officer, who identified his own written report of the accident and as to statements made to him by the bus operator at 8th and Walnut Streets that evening following the accident. Over the objection of defendant that such statements were not binding on the defendant and not a part of the *res gestae*, the witness testified that the operator told him that the collision had occurred "in the crosswalk on 15th Street at the west of Woodland". Upon cross-examination witness stated that it was a very stormy night and he had difficulty in driving his own Ford car on account of the bad visibility. Witness was asked if, during that conversation with the operator "when the matter was all fresh in his mind at 8th and Walnut, when you saw him immediately following the accident and at the time you took the plaintiff in charge", he discussed with the operator how close plaintiff was to the front of the bus at the time plaintiff walked or ran into its path. Witness answered that the operator stated he was 6 feet from the bus. The operator told him that the speed of the bus at the time was 6 miles an hour, and that the bus had traveled about 8 feet after striking the boy.

At the conclusion of all the evidence, defendant moved for a directed verdict in its favor on the ground that plaintiff had wholly failed to prove his case against the defendant, which motion was overruled.

At the request of plaintiff, the Court gave its Instruction "A", as follows:

"The court instructs the jury that if you find and believe from the evidence that prior to being struck, on the occasion referred to in evidence, plaintiff became and was in a position of imminent peril of being struck and injured by defendant's trolley bus, and that defendant's operator, by the exercise of ordinary care, could have seen plaintiff in the aforesaid position of imminent peril, if you so find, in time thereafter, if so, by the exercise of ordinary care, and by the use of the appliances on said trolley bus and with reasonable safety to himself, defendant's said trolley bus and all persons riding thereon, to have, by the exercise of ordinary care, stopped said trolley bus, if you so find, or to have slackened the speed thereof sufficiently to have avoided striking plaintiff, if you so find, or to have changed the course of said trolley bus sufficiently and in a manner so as to have avoided collision with plaintiff, if you so find, or to have sounded a timely and effective warning of the approach of said bus, if you so find, and that defendant's operator failed so to do and was thereby negligent if you so find, and that such negligence caused or directly contributed to cause plaintiff to be struck and injured, if you so find, then you are instructed that your verdict shall be for plaintiff and against defendant, Kansas City Public Service Company, *and this is the law and is true under the above circumstances and conditions set forth, if you so find them even though you should also find and believe from the evidence that any act or omission, if any, of plaintiff directly contributed to him getting into or being in the aforesaid position of imminent peril if you so find*". (Italics supplied).

Appellant's first objection to plaintiff's Instruction "A" is that the Court erred in submitting the case thereby on the humanitarian doctrine. Appellant contends that plaintiff is bound by his own admissions, and that his own evidence shows that no submissible case was made; and that his own negligence was the sole cause of the collision.

In considering plaintiff's evidence in its most favorable light and that part of defendant's evidence which tends to support the plaintiff, we find that such evidence on the humanitarian feature is materially the same as in the former trial and reviewed by the Supreme Court in Bootee v. Kansas City Public Service Company, 183 S. W. (2d) 892. The reasoning and conclusions of the Supreme Court as therein stated, loc. cit. 895, are binding herein, and we, accordingly, hold that on the record before us a submissible case was made under

the humanitarian doctrine. See, also, Marczuk v. St. Louis Public Service Co., 196 S. W. (2d) 1000, 1002, 1003.

Appellant next objects to Instruction "A" on the ground that the last clause thereof italicized by us permitted recovery on alleged primary negligence through elimination of the defense of contributory negligence; ignored and excluded the question of "sole cause" negligence of plaintiff; was misleading; susceptible of improper interpretation, and misinterpreted by counsel in argument. Appellant states further that it permitted the jury to create an undefined and unlimited zone of peril, unjustified by the evidence; improperly injected the issue of defendant's antecedent negligence, eliminating plaintiff's own and sole negligence, the cause of the collision. It argues further that the jury might well have understood that the blackness of the night, violence of the wind and rain, and the lack of visibility were not to be considered; that it gave the jury a roving commission to find for the plaintiff regardless of plaintiff's blindness, negligently placing himself in front of the approaching bus too late to escape, and too late for the motorman to stop.

This court approved an instruction in practically the identical words in a humanitarian case,— Ramel v. Kansas City Public Service Co., 187 S. W. (2d) 492, 497, wherein there were sufficient limiting references made to the time and place in question and circumstances set forth as to meet the objection stated. Such references are sufficient in the instruction before us, especially when all the instructions are considered together and, particularly, defendant's Instruction 4, which presents the same issues conversely. We believe the present Instruction "A" was not erroneous in the respects under consideration. We overrule appellant's second objection to the instruction.

Appellant's third objection to Instruction "A" is that the words "to have sounded a timely and effective warning" is not tied in with the previous words "so as to have avoided collision with the plaintiff", and therefore not properly a part of an instruction under the humanitarian theory; that the warning clause allows consideration of antecedent negligence and was not sufficiently limited as to time after the operator saw or might have seen plaintiff in a position of peril. Instruction "A" at the outset is predicated and conditioned upon a finding that "plaintiff became and was in a position of imminent peril of being struck", etc., and, we believe, limits the warning clause to that time only, and that it is not susceptible of the other objections made. Not only that but, at defendant's request, Instruction 4 was given which is a converse instruction, and so limits the warning clause, and follows immediately with the words "after plaintiff was in a position of imminent peril, in time to have avoided said collision." These two instructions on the same subject should be considered together. [Johnson v. Dawidoff, 352 Mo. 343, 177 S. W.

(2d) 467, 469, 470.] There is no merit in appellant's third objection to Instruction "A".

Appellant claims error in rulings made in the course of the final argument of plaintiff's counsel. Among other things, counsel said: "The operator said he spent a whole day before he gave his deposition talking to claim agents, investigators and lawyers. This is a lawyer-made case." On objection to this statement and request for reprimand, THE COURT said: "Yes, be sustained. I don't think that is fair." Defendant's counsel then moved for mistrial, which was overruled. Again plaintiff's counsel said in his argument, after referring to defendant's effort to prove the plaintiff's condition complained of to be the result of syphilis, "they have engaged in a smear campaign." Upon objection and request for a reprimand, THE COURT said: "Well, the jury has heard the evidence and will be guided by the evidence." Motion for mistrial was overruled. Later, in referring to plaintiff's physical handicap, including the injury to his shoulder in the accident, plaintiff's counsel stated: "The only way this boy can enjoy even the barest necessities of life after his mother passes is by labor." Objection was made and also a motion to instruct the jury to disregard the statement. THE COURT said: "Well, the jury will be guided by the law and evidence and not by argument." Motion for mistrial was overruled. In closing, plaintiff's counsel stated to the jury: "I thank you again on the part of this boy and his mother for the very close attention you have given to all the evidence in the case." Thereupon motion was made for mistrial on the ground that the whole of the argument of plaintiff's counsel was an appeal to the passion, prejudice and sympathy of the jury. The motion was overruled. At one point in the argument plaintiff's counsel said: "The slightest warning before this boy got in front of this bus would have avoided the accident and Mrs. Poteet, sitting there as a passenger in the bus, without any duty under the sun, saw this boy in the street, and she said she saw this boy." No specific objection was made at the time of this statement, but respondent applies to it the final request for mistrial made at the end of the argument above mentioned.

The trial judge had heard the witnesses in both trials of this case. He was familiar with the issues and the circumstances surrounding the trial. He several times warned the jury to be guided by the evidence and not the argument objected to, and once ruled that a statement of plaintiff's counsel was not fair. The Court's rulings on the motions for mistrial were matters resting in its sound discretion. In Crews v. Kansas City Public Service Co., 341 Mo. 1090, 111 S. W. (2d) 54, the Supreme Court said, loc. cit. 62:

"The trial court is allowed considerable discretion in permitting and restraining arguments which will not be interfered with unless clearly abused. The whole matter of prejudicial argument was before the trial court, and the judge was in a position to know all that was said,

how it was said, and all the surrounding circumstances of the trial. We are inclined to accept his ruling on the motion for new trial in view of what we find in this record.''

In plaintiff's case in chief, police officer Gardner was put on the stand and identified his own written statement or report of the accident. Upon the objection of defendant he was not permitted to testify therefrom as to what defendant's operator told the witness at 8th and Walnut Streets immediately following the accident, as to where the plaintiff was when the bus struck him. When the ruling was made, plaintiff's counsel stated: "I presume Your Honor's ruling will be the same on the other matters I intend to inquire about,'' to which The Court said: Yes.'' Thereupon the witness was dismissed for the time being. The witness later testified in rebuttal to the conversation referred to. Appellant contends that the proceedings in witness Gardner's first appearance were prejudicial and for the purpose of creating the impression with the jury that some harmful evidence was being concealed by defendant's objection. The only objection made at the time was to the admission of the alleged conversation, which was not admitted by the court. The context of the record shows no evidence of bad faith on the plaintiff's part in the instance referred to and we believe the same was, under all the record, harmless.

Lastly, appellant argues that the verdict and judgment were excessive. This was presented to the trial court on motion for a new trial, and the Court ruled that unless a remittitur of $5000 were made within ten days, the motion would be sustained. Accordingly, the remittitur was made and the judgment reduced from $10,000 to $5,000. We find no reason to hold that the Court in so doing abused its discretion, and in view of all the evidence, we conclude that the Court's action should not be disturbed. Judgment is affirmed. All concur.